# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| ANN K., | Case No. 4:20-CV-00234-REP |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| vs. | **(Dkts. 1, 8 & 22)** |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | |

Pending is Petitioner Ann K.'s Petition for Review (Dkt. 1) and an accompanying Motion for Summary Judgment (Dkt. 22) appealing the Social Security Administration's final decision finding her not disabled and denying her claim for disability insurance benefits. *See* Pet. for Rev. (Dkt. 1). This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order.

## ADMINISTRATIVE PROCEEDINGS

This case has an extensive procedural history. Petitioner has been pursuing disability benefits for the better part of a decade, alleging that a constellation of conditions, including migraines, chronic fatigue syndrome, fibromyalgia, obesity, depression, and anxiety, collectively render her incapable of working. Petitioner first filed an application for social security disability income ("SSDI") as well as an application for supplemental security income ("SSI") on March 6, 2013. Pt.'s Br. at 2 (Dkt. 22). That claim was denied initially and on reconsideration and thereafter, on June 12, 2014, Petitioner filed another claim for the same kinds of benefits. After

this claim was also denied by an initial determination, Petitioner filed a third claim for the same type of benefits, alleging a disability onset date of June 1, 2014. AR[1] 14. This claim went to a hearing before Administrative Law Judge ("ALJ") Christopher Inama, who issued an unfavorable decision. *Id.* Petitioner took her claim to the Appeals Council, which remanded the case to the ALJ with instructions to further develop the record with respect to Petitioner's fibromyalgia and claims of disabling depression and anxiety. AR 199-200.

The ALJ conducted a second hearing on January 30, 2019, at which Petitioner was present and represented by counsel. AR 13. On April 22, 2019, the ALJ issued a second unfavorable decision. AR 13-29. The Appeals Council denied Petitioner's request for review in April 2020 (AR 1-3), making the ALJ decision the final decision of the Commissioner of Social Security.

Having exhausted her administrative remedies, Petitioner filed this case. Petitioner's Motion for Summary Judgment raises several points of error, most of which relate to the ALJ's decision to give less than controlling weight to the opinions of various medical sources. First, she argues that the ALJ erred in giving only partial weight to the opinions of a consulting psychologist named Dr. Jeffrey Elder, who conducted a mental status evaluation of Petitioner in December of 2018 at the request of the ALJ and Disability Determination Services ("DDS"). Pt.'s Br. at 10-13 (Dkt. 22). Second, Petitioner argues that the ALJ made a similar error in declining to give great weight to the opinions of a consulting psychologist named Dr. Nels Sather, who conducted an earlier examination of Petitioner at the behest of DDS, in September of 2014. *Id.* at 13-14. Third, Petitioner argues that the ALJ failed to give appropriate weight to the opinions of her treating doctor, Dr. Stephen DeNagy. *Id.* at 14-16. Finally, Petitioner argues

---

[1] Citations to "AR __" refer to the cited page of the Administrative Record (Dkt. 19).

**MEMORANDUM DECISION AND ORDER - 2**

that the ALJ did not provide a sufficiently detailed justification for discrediting Petitioner's testimony regarding the extent of her pain and fatigue. *Id.* at 16-17.[2]

## **STANDARD OF REVIEW**

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. 42 U.S.C. § 405(g); *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017). Findings as to any question of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g). In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence. *See Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The standard requires more than a scintilla but less than a preponderance. *Trevizo*, 871 F.3d at 674. It "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the Court is to review the record as a whole to decide whether it contains evidence that would allow a person of a reasonable mind to accept the conclusions of the ALJ. *Richardson*, 402 U.S. at 401; *see also Ludwig*, 681 F.3d at 1051. The

---

[2] Petitioner's briefing alludes to, but fails to preserve, two other arguments. First, in the "Issues" section of her opening brief, Petitioner asks: "Whether the ALJ addressed [Petitioner's] mental and physical residual functional capacity in his decision?" Pt.'s Br. at 9 (Dkt. 22). This is the only reference to the RFC in the entirety of Petitioner's briefing. Second, in her reply brief, Petitioner challenges, for the first time, the ALJ's treatment of the opinions of her rheumatologist, Dr. Howard Gandler. Petitioner has waived both issues by failing to argue them with any specificity in her opening brief. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (issues which are not specifically and distinctly argued and raised in a party's opening brief are waived).

**MEMORANDUM DECISION AND ORDER - 3**

ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Treichler*, 775 F.3d at 1098. Where the evidence is susceptible to more than one rational interpretation, the reviewing court must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. *Ludwig*, 681 F.3d at 1051. In such cases, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ. *Batson v. Comm'r of Social Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

The decision must be based on proper legal standards and will be reversed for legal error. *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015); *Treichler*, 775 F.3d at 1098. Considerable weight is given to the ALJ's construction of the Social Security Act. *See Vernoff v. Astrue*, 568 F.3d 1102, 1105 (9th Cir. 2009). However, this Court "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

## THE SEQUENTIAL PROCESS

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is work activity that is both substantial and gainful. 20 C.F.R. §§ 404.1572, 416.972. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the

claimant is engaged in SGA, disability benefits are denied regardless of his or her medical condition, age, education, and work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner did not engage in substantial gainful activity since June 1, 2014, the alleged onset of her disability. AR 16.

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522, 416.922. If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found that Petitioner had the following severe impairments: cervical degenerative disc disease, right knee osteoarthritis, depression, generalized anxiety disorder, fibromyalgia, and post-traumatic stress disorder ("PTSD"). AR 16. The ALJ also discussed Petitioner's history of migraine headaches. While acknowledging that she had experienced headaches most of her life, the ALJ concluded that they were not severe enough to interfere with her capacity to perform work-related activities. AR 17. The ALJ also concluded that Petitioner's alleged chronic fatigue syndrome was not a medically determinable impairment. AR 18.

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments neither meet nor equal a listed impairment, the claim cannot be resolved at step three and the evaluation proceeds to step four.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the ALJ found that Petitioner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  AR 18.

In the fourth step of the evaluation process, the ALJ decides whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. §§ 404.1545, 416.945.  An individual's past relevant work is work she performed within the last 15 years or 15 years prior to the date that disability must be established, if the work was substantial gainful activity and lasted long enough for the claimant to learn to do the job.  20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  Here, the ALJ found that physically, Petitioner would be capable of performing light work, with certain additional limitations, including that she could sit only for one hour at a time, for a total of seven out of eight hours, and could walk only for one hour at a time, for a total of four out of eight hours.  The ALJ also concluded that Petitioner would be limited to simple, routine tasks, occasional interaction with supervisors and co-workers with no tandem tasks, and that she could not work in a situation requiring public contact.  AR 20.

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of his impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Garrison v. Colvin,* 759 F.3d 995, 1011 (9th Cir. 2014). If the claimant can do such other work, he is not disabled; if the claimant cannot do other work and meets the duration requirement, he is disabled. Here, the ALJ found that as of the date of his decision, Petitioner was not capable of performing her past relevant work, but that she was currently capable of working full time as a bench assembler, small products assembler, or inserting machine operator, and that these jobs existed in significant numbers in the national economy. AR 29. Based on these findings, the ALJ concluded that Petitioner was not disabled. *Id.*

## **DISCUSSION**

I.     The Medical Opinion Evidence

Petitioner raises several points of error relating to the ALJ's assessment of the medical opinion evidence. Because this case arose prior to March 17, 2017, the older rules guiding an ALJ's evaluation of treating sources apply to the Court's review of the ALJ's discussion of the opinion evidence. 20 C.F.R. §§ 404.1527 and 416.927.

These rules distinguish among medical opinions based on whether the physician providing the opinion: (i) treated the claimant (a treating physician), (ii) examined but did not treat the claimant (an examining physician), or (iii) neither examined nor treated the claimant (a non-examining or reviewing physician). *Garrison*, 759 F.3d at 1012. In general, the opinions of treating physicians are given more weight than the opinions of examining physicians, and the

opinions of examining physicians are afforded more weight than the opinions of reviewing physicians. *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014). "The treating physician's opinion is not, however, necessarily conclusive." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Under Ninth Circuit law, an ALJ may reject the "uncontradicted" opinion of a treating or examining doctor where the ALJ identifies "clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Social Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

Where there are conflicts among the medical sources, the standard of review is not as high. In these circumstances, "the ALJ is charged with determining credibility and resolving the conflict" among the opinions of the treating, examining, and reviewing doctors. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). In so doing, the ALJ may reject the controverted opinion of a treating or examining physician where the ALJ provides "specific [and] legitimate reasons" that are "based on substantial evidence in the record." *Andrews v. Shalala*, 53 F.3d 1035, 1041-42 (9th Cir. 1995).

    A. <u>Because the opinions of Dr. Sather, Dr. Elder, and Dr. DeNagy were "contradicted," the ALJ was not required to provide "clear and convincing" reasons for rejecting them.</u>

Petitioner argues that the opinions of her treating and examining doctors were uncontradicted, and therefore that they could only be rejected if the ALJ established clear and convincing reasons for doing so. Respondent, on the other hand, asserts that the Petitioner's preferred opinion evidence was contradicted*,* and that the ALJ needed only to demonstrate specific and legitimate reasons for discounting it.

Unfortunately, the parties offer almost no substantive discussion of this critical issue. The entirety of Respondent's argument on this point consists of the following sentence:

**MEMORANDUM DECISION AND ORDER - 8**

"Multiple opinions provided that [Petitioner] was less limited than these providers found."

Res.'s Br. at 6 (Dkt. 23) (citing to five pages of the ALJ's decision). Respondent provides no

direct citations to the allegedly conflicting evidence and never identifies, by name, which

medical sources Respondent believes contradict the opinions of Dr. Elder, Dr. Sather, and Dr.

DeNagy. Petitioner's reply is similarly lacking in analysis. Petitioner never acknowledges the

dispute over the standard of review and never discusses the readily apparent conflicts within the

medical evidence.

Because the parties' disagreement over the correct standard of review cannot be

sidestepped, the Court has conducted its own review of the medical source opinions. Based on

its review, the Court agrees that the ALJ's decision (AR 24-27) outlines clear conflicts among

Petitioner's treating, examining, and reviewing doctors regarding Petitioner's work-related

mental capabilities and her ability to work.

On one end of the spectrum, the DDS consulting physicians, who reviewed Petitioner's

medical records in 2015, determined that Petitioner's mental health posed no more than mild

limitations on her ability to work and that she was capable of performing light work. AR 119-

120, 125-126, 163-166, 172.

In the middle of the spectrum, the two examining psychologists, Dr. Sather and Dr. Elder,

both concluded that Petitioner's mental health prognosis was "guarded," with some work-related

abilities remaining intact and others being impaired. AR 539-540, 1656. For example, Dr.

Sather opined that Petitioner's "ability to perform work related mental activities" was "fair"

unless she was experiencing fatigue, at which time her "functioning deteriorates significantly and

she is unable to perform work-related mental activities." AR 540. In a variation on this theme,

Dr. Elder determined that Petitioner possessed "a mixed capacity to perform work-related mental

activities," depending on the type and complexity of the activity. AR 1656. According to Dr. Elder, Petitioner's "basic cognitive functioning" remained intact allowing her the ability to complete "simple work related tasks . . . without excessive support." AR 1647. As Dr. Elder saw it, however, Petitioner experienced moderate limitations in her ability to persist (AR 1656) and marked and extreme limitations in her ability to complete complex tasks and engage in social interactions (AR 1647-1648).

On the opposite side of this spectrum, Petitioner's treating physician, Dr. DeNagy, adopted the most dismal view of Petitioner's condition. Based on his treatment of Petitioner, Dr. DeNagy concluded that Petitioner experienced marked or extreme limitations in eight out of ten mentalhealthrelated work domains, including her ability to carry out simple instructions. AR 1523-1524. Given these impairments, Dr. DeNagy concluded that Petitioner was "significantly disabled" and unable to work at a normal job. AR 1819, 1713-1714.

As this summary illustrates, the medical source opinions contain multiple levels of disagreement. Not only do the opinions of Dr. DeNagy, Dr. Elder, and Dr. Sather conflict with each other, their opinions are all controverted by the opinions of the DDS physicians. These differences cannot be neatly explained away by changed circumstances or deterioration of Petitioner's mental state over time. All of the doctors – the reviewing DDS doctors and Drs. DeNagy, Elder, and Sather – purport to describe how Petitioner was functioning after Petitioner avers that she had become "completely disabled" by headaches, fatigue, pain, and depression. AR 54-55 (alleging a disability onset date of June 1, 2014). Dr. DeNagy, the doctor who found that Petitioner had the most extreme mental and physical limitations, specifically opined that these disabling limitations were "first present" beginning in 2007, long before the assessments of the other physicians. AR 1524. Dr. Elder also opined that Petitioner was suffering from various

marked or extreme mental health limitations as early as 2015. AR 1648. This is the same year that the DDS reviewing physicians determined Petitioner's anxiety, depression, and other conditions caused her no more than "mild" or "slight" mental problems. AR 119-120, 164-65.

Further complicating the picture, Dr. Elder's December 2018 evaluation paints a far less dire picture of Petitioner's mental health than Dr. DeNagy's earlier statements. For example, in February 2017, Dr. DeNagy found "marked" or "extreme" limitations in Petitioner's ability to understand, remember, or carry out simple instructions and in her ability to make simple work-related decisions. AR 1523. In December 2018, however, Dr. Elder found only "moderate" limitations in these areas. AR 1647. In October 2017 and October 2018, Dr. DeNagy also opined that Petitioner was incapable of holding down any non-sheltered employment. AR 1819 and 1713-1714. Dr. Elder's December 2018 opinion is more reserved. Although Dr. Elder determined that Petitioner has significant mental health limitations, he noted that Petitioner retained the mixed capacity to perform work-related mental activities, with good understanding, only mildly impaired recall and memory, and adequate concentration. AR 1656. Looking at Dr. DeNagy's and Dr. Elder's opinions side-by-side, it is evident that the latter endorsed an overall higher level of functioning than did the former, despite Dr. Elder having evaluated Petitioner after Dr. DeNagy.

In summary, the medical source opinions, which the ALJ was required to consider, contained legitimate and important conflicts regarding (i) Petitioner's ability to work and (ii) the extent of Petitioner's mental health limitations. Accordingly, the ALJ was only required to provide "specific and legitimate reasons" supported by substantial evidence when rejecting the contradicted opinions of Dr. DeNagy, Dr. Elder, and Dr. Sather. *Andrews*, 53 F.3d at 1041-42.

B. The ALJ identified specific and legitimate reasons supported by substantial evidence for affording only partial weight to the opinions of Dr. Sather.

On September 3, 2014, Dr. Sather, a licensed psychologist, conducted a mental status examination of Petitioner at the behest of DDS.[3] AR 533. In his subsequent written report, Dr. Sather acknowledged that Petitioner suffered from both mental illness and various chronic medical conditions, such as fibromyalgia and chronic fatigue. AR 533 and 539. The focus of Dr. Sather's assessment, however, was on Petitioner's mental status, not her physical impairments. AR 533-540.

In accordance with this focus, Dr. Sather diagnosed Petitioner with several mental illnesses, including persistent depressive disorder and panic disorder. AR 539. He concluded that Petitioner's "ability to perform work related mental activities, such as understanding, remembering, sustaining concentration, persisting with tasks, interacting socially and adapting to workplace change" would be "fair" unless she was "experiencing fatigue," at which times her mental functioning would deteriorate "significantly" and she would be "unable to perform work-related mental activities." AR 540. He further opined that certain long-term treatment interventions might improve Petitioner's "psychological ability to sustain employment but [would] not impact her chronic medical conditions." *Id.*

After carefully summarizing this report, the ALJ afforded "some weight" to Dr. Sather's opinion that Petitioner's overall mental functioning was "fair" when she was not fatigued. AR 24. The ALJ explained that this portion of the report was "consistent with [Dr. Sather's] objective findings and the objective finding[s] throughout the record." *Id.* By contrast, the ALJ viewed Dr. Sather's conclusion that Petitioner is unable to work when she is fatigued as

---

[3] The Court addresses the opinions of the physicians in chronological order.

**MEMORANDUM DECISION AND ORDER - 12**

unsupported by "objective evidence" and "based solely" on Petitioner's subjective complaints. *Id.* The ALJ consequently rejected this particular opinion.

Petitioner asserts that this rejection constitutes legal error because a psychological evaluation "cannot be discounted as appearing to be based on subjective evidence." Pt.'s Br. at 13 (Dkt. 22). Petitioner is correct that an ALJ may not reject the report of a psychologist "simply because of the relative imprecision of the psychiatric [or psychologic] methodology" which necessarily depends "in part on the patient's self-report, as well as on the clinician's observations of the patient." *Buck v. Berryhill*, 869 F.3d 1040, 1049) (9th Cir. 2017). The reason for this rule is that clinical interviews and mental status evaluations, while always based on self-reports, are nevertheless "objective measures" that ALJs may not routinely disregard. *Id.*

This does not mean that psychological opinions are insulated from all review or that such opinions are binding on the ALJ no matter how diagnostically unsound. An ALJ need not accept the opinion of any physician, including a psychiatrist or psychologist, if that opinion is "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). In *Bayliss*, the Ninth Circuit held that an ALJ properly rejected two psychological assessments where those assessments were brief, conclusory, and were unsupported by any "clinical evidence" other than the petitioner's unadorned subjective complaints. *Id.* at 1217. Taken together, these cases prohibit ALJs from rejecting psychological opinions for routine reliance on self-reports, but permit ALJs to reject psychological opinions, as they would any other medical opinion, where the opinion is conclusory, unsupported, and based on questionable diagnostic techniques.

The ALJ appropriately analyzed Dr. Sather's opinions under these standards. First, the ALJ gave "some weight" to Dr. Sather's conclusions regarding Petitioner's non-fatigued mental

functioning, because these opinions were grounded in his testing and his clinical interview.  AR 24.  The ALJ, however, rationally declined to credit Dr. Sather's one-sentence, conclusory statement finding that Petitioner was unable to work when fatigued.  *Id.*

As the ALJ recognized, this brief statement was not supported by any of Dr. Sather's psychological testing, diagnoses, or clinical findings.  Dr. Sather's testing and interview showed that Petitioner had an above average IQ, good judgment regarding her need for treatment, and "organized and goal-directed" thought processes.  AR 535 and 537.  Dr. Sather found that these cognitive abilities translated to a "fair" ability to perform work-related mental activities during the times when Petitioner was not incapacitated by her chronic fatigue.  Significantly, Dr. Sather did not diagnose Petitioner with any medical conditions related to fatigue.  AR 533-540.  He did not assess the frequency or extent of her fatigue.  *Id.*  He did not see Petitioner on multiple occasions, including when she was exhausted by her medical conditions, so as to assess her mental functioning while in various states of fatigue.  *Id.*  In Dr. Sather's eight-page report, the Court can discern no medically grounded explanation for his conclusion that fatigue would have a disabling impact on Petitioner's ability to think, concentrate, or engage in other work-related mental activities.  *Id.*  As it relates to fatigue, Dr. Sather's report merely recounts Petitioner's unfiltered complaints without any psychological analysis or interpretation.  For instance, Dr. Sather writes (i) that "Ms. Kennedy stated that she does well starting and finishing tasks unless she is fatigued.  She has Epstein Barr Syndrome and Fibromyalgia, both of which cause chronic fatigue" and (ii) that "Ms. Kennedy stated that she does well adjusting to change at work unless she is feeling fatigued."  AR 538.  It is not at all clear that Dr. Sather exercised *any* psychological expertise or judgment when he incorporated this information wholesale into one-sentence of his conclusions.

**MEMORANDUM DECISION AND ORDER - 14**

The ALJ was not required to accept such an ambiguous and barebones assertion. *See Bayliss*, 427 F.3d at 1217.

    C.  <u>The ALJ identified specific and legitimate reasons supported by substantial evidence for rejecting the opinions of Dr. DeNagy.</u>

The record contains multiple opinions by Dr. DeNagy suggesting that Petitioner lacks the capacity to work. Broadly speaking, these opinions fall into two categories: (i) opinions regarding Petitioner's specific functional limitations and (ii) ultimate opinions regarding Petitioner's inability to maintain employment.

Starting with the first category, Dr. DeNagy filled out a form in February of 2017 addressing Petitioner's mental impairments in terms of the specific mental and cognitive criteria needed to function in the workplace. AR 1523-25. In this document, Dr. DeNagy opined that Petitioner had "marked" or "extreme" limitations in understanding, remembering, and carrying out instructions and making any work-related judgments. AR 1523. As for Petitioner's social functioning, he opined that she had "moderate" limitations in interacting appropriately with the public and with supervisors and "marked" limitations in interacting appropriately with co-workers and in responding appropriately to workplace changes. AR 1524. Dr. DeNagy explained that these impairments were caused, at least in part, by Petitioner's "severe" anxiety and depression. AR 1523.

Turning to the second category, Dr. DeNagy's medical records include multiple notes opining that Petitioner is disabled. Most recently, in October 2018, Dr. DeNagy wrote that Petitioner's "illnesses have been so severe, particularly her fibromyalgia, depression, anxiety, and migraines that she has not been able to make a supportive wage." AR 1710. He further stated:

There is no way that between her headaches, her anxiety, depression, lassitude, suicidal ideation that any type of reasonable employer would be able to retain her and they themselves, if she where [sic] in such a setting in a business, would have to fall back on the FMLA rules in order to legally constrain their prerogative to fire her, but given the fact that she has a disabling condition, the FMLA would constrain their hand at least for a time, and it is unreasonable to think that a person could approach an employer with the intention of invoking the FMLA as soon as they were hired.

AR 1713-1714.

The ALJ provided a litany of reasons for rejecting these opinions. AR 24-25. Included within this list are multiple reasons the Ninth Circuit has identified as "specific and legitimate" grounds for discounting the opinions of a treating physician.

> i.   *Inconsistency Between Dr. DeNagy's Opinions and the Medical Record*

The most robust reason the ALJ identified for rejecting the opinions of Dr. DeNagy was the conflict between these opinions and the remainder of the medical record. AR 24-25.

Inconsistency between the opinions of a treating physician and the notes of other medical providers can be a specific and legitimate reason for an ALJ to discredit the opinions of the treating physician. *Ghanim*, 763 F.3d at 1161. The same is true of inconsistency within a treating physician's file. *Id.* "A conflict between a treating physician's medical opinion and his own notes is a clear and convincing reason for not relying on the doctor's opinion, and therefore is also a specific and legitimate reason for rejecting it." *Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020) (internal citations omitted).

Here, the ALJ identified numerous instances in the record where various providers found that Petitioner's thought processes, attention and concentration, and memory were all normal and that her judgment and insight were "good." AR 24. For example, between 2015 and 2018, Petitioner received counseling services at Pearl Health Clinic from Licensed Professional

Counselor Bonita Avery.  AR 1238-1522, 1689-1836.[4]  Although this is the same clinic where Dr. DeNagy worked, the records of Counselor Avery do not reflect the tremendous mental impairments that Dr. DeNagy endorsed.  Counselor Avery repeatedly and regularly found Petitioner to be oriented to person, place, and time and did not document significant impairments in understanding or judgment.  *See generally id.*

Other medical providers made similar findings through the relevant time frame.  *See*, *e.g.*, Treatment Record of Dr. Matthew J. Fackrell, AR 582-583 (finding that Petitioner had intact insight and judgment and noting that her symptoms were only "minimally" affecting her ability to function during the day); Treatment Record of Dr. Holly Zoe, AR 783 (having a "lengthy conversation" with Petitioner about Petitioner's medical and social background and then concluding that Petitioner was not "easily distracted" in the domains of attention/concentration); Treatment Record of Licensed Clinical Professional Counselor Jill Weadick, AR 1429 (conducting a diagnostic assessment and finding that Petitioner, while suffering from major depressive disorder and hypersomnia, had intact memory, normal thought, average cognition, and no impairments to her judgment); Treatment Records of Certified Physician Assistant Jed Willardson AR 1595-1596, 1606-1607, 1618, 1624-1625, 1629 (finding that Petitioner was oriented to person, place, and time, that her speech demonstrated "a thought process that is logical and goal directed," and that her insight was "good," with "no lack of memory concentration or attention span"); Treatment Record of Physician Assistant Alan Adams, AR 1555 (noting that Petitioner has good judgment, was appropriately oriented, and had normal memory).

---

[4] Dr. DeNagy's and Counselor Avery's records are intermixed within the same two exhibits, 15F and 31F, cited above.  For ease of reference and because Counselor Avery's records predominate, the Court has cited to the entire exhibit.

**MEMORANDUM DECISION AND ORDER - 17**

Petitioner was even noted to have good insight and judgment during flare ups of her fibromyalgia and headaches. She was evidently able to speak logically and coherently, with normal thought processes, sometimes even when she was describing pain at a level of 8/10. AR 1559, 1563, 1595-96, 1607, 1625, 1629.[5]

In addition to these external inconsistencies, the ALJ reasonably concluded that Dr. DeNagy's own treatment notes did not align with the marked and extreme limitations reported on the 2017 questionnaire. AR 24. Most notably, on the questionnaire, Dr. DeNagy reported that Petitioner had "marked" limitations in her ability to understand, remember, and carry out simple instructions and "extreme" limitations in her ability to make judgments on simple work-related decisions. In contrast to these findings, Dr. DeNagy's own treatment notes regularly affirmed that Petitioner had "excellent" or "tremendous" insight. *See, e.g.*, December 8, 2016 Treatment Note, AR 1246 (Petitioner's insight was "excellent" and her judgment was unimpaired); September 2, 2016 Treatment Note, AR 1279 (Petitioner's insight was "tremendous"); February 25, 2016 Treatment Note, AR 1384 (Petitioner's insight and judgment were "excellent;" her thought processes were "coherent" and "goal directed;" and her memory was intact); December 11, 2015 Treatment Note, AR 1399 (Petitioner's insight and judgment were "intact"); February 6, 2015 Treatment Note, AR 697 (Petitioner's judgment was unimpaired and her though content, although "tired," was still "logical" and "coherent").

The discrepancy between these treatment records and Dr. DeNagy's February 28, 2017 functional assessment (AR 1523-1525) was a specific and legitimate reason, supported by substantial evidence, for the ALJ to give Dr. DeNagy's findings of marked and extreme mental

---

[5] All of the treatment records that the Court cites were cited by the ALJ as a basis for rejecting the opinions of Dr. DeNagy. AR 24.

impairments little weight.[6]  *See Ford*, 950 F.3d at 1154, 1157 (an ALJ may reject an opinion of a treating physician where there is substantial evidence to support the conclusion that the physician's opinion is inconsistent with his own notes and with the records of other treatment providers).

### ii. *Petitioner's Reported Activities*

The Court also finds that the Petitioner's reported activities, including her part-time employment, are a specific and legitimate reason supporting the ALJ's decision to give little weight to Dr. DeNagy's opinions.  It is well-settled that a conflict between a Petitioner's daily activities and the opinion of a treatment provider may justify rejecting that treating provider's opinion.  *Ford*, 950 F.3d at 1155; *Ghanim*, 763 F.3d at 1162.

In his decision, the ALJ reasoned that the marked and extreme limitations documented by Dr. DeNagy were "incongruent" with Petitioner's "reported activities, including taking care of and home schooling her autistic son, attending church, managing her own finances, going shopping, performing household chores and cooking, and working."  AR 24.  Petitioner contends that this conclusion was not supported by substantial evidence because she goes out of her house on a "need basis only," only prepares simple meals, only goes to church once a month, and only does housework with the assistance of her son.  Pt.'s Br. at 15 (Dkt. 22).

Petitioner understates her level of reported activities.  Petitioner is correct that not all activities of daily living are inconsistent with impairment.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("many home activities are not easily transferable to what may be the more grueling environment of the workplace").  However, the ALJ reasonably determined that

---

[6] Notably, Petitioner makes no argument to the contrary in her briefing.  Petitioner simply does not address this portion of the ALJ's reasoning and does not attempt to explain why it did not provide a valid reason for the ALJ's rejection of Dr. DeNagy's opinion.

**MEMORANDUM DECISION AND ORDER - 19**

Petitioner regularly engaged in mentally and socially taxing activities that were inconsistent with a finding that Petitioner suffers from marked and severe impairments across all domains of understanding, remembering, and decision-making.

To take one example, throughout his decision, the ALJ stressed that Petitioner managed her own finances and was the sole caretaker for an autistic child. AR 22, 24. The Court agrees with the ALJ and with Respondent that these activities would require, at a bare *minimum*, the routine ability to understand and remember simple instructions, carry out simple tasks, and make simple decisions as well as the capacity to complete complex tasks on occasion.

Petitioner's history of employment, while suffering from the impairments she alleges, bolsters the conclusion that Petitioner has these cognitive abilities. *See Ford*, 950 F.3d at 1156 ("An ALJ may consider any work activity, including part-time work, in determining whether a claimant is disabled."). As the ALJ noted, during the time in which Petitioner claims to have been disabled, she has worked for ten to fifteen hours a week as a peer counselor. AR 22. This job required her to meet with other clients suffering from mental health issues, to complete paperwork, and other tasks of that nature. *Id.* The ALJ reasonably concluded that Petitioner's ability to engage in these activities on a part-time basis, showed that Petitioner did not suffer the extreme and marked cognitive and social impairments Dr. DeNagy reported. Because this conclusion was supported by substantial evidence, this Court must uphold the ALJ's decision.

*iii. Dr. DeNagy's Lack of Vocational Expertise*

After rejecting Dr. DeNagy's opinions regarding Petitioner's mental health functioning across various work-related domains, the ALJ next considered Dr. DeNagy's opinion that Petitioner was unable to maintain employment due to a constellation of physical and mental

conditions. AR 25. The ALJ provided several reasons for discrediting this opinion, including Dr. DeNagy's lack of vocational expertise. *Id.*

Petitioner has not presented any challenge to this portion of the ALJ's decision. Nor would such a challenge be successful. As Respondent argues, Dr. DeNagy's opinion about Petitioner's ability to retain employment rests on several non-medical assumptions. *See* Res.'s Br. at 10 (Dkt. 23). First, Dr. DeNagy opined that Petitioner's employment as a peer support specialist does not demonstrate an ability to work because this employment is "minimally paid" and is "a sheltered workshop type setting." AR 1713-1714. Second, Dr. DeNagy speculated that a "reasonable" business would not retain Petitioner because she would have to "fall back on the FMLA rules in order to legally constrain their prerogative to fire her" and "it is unreasonable to think that a person could approach an employer with the intension [sic] of invoking the FMLA as soon as they were hired." *Id.*

The ALJ rationally concluded that these opinions deserved little, if any, weight. *See Javalera v. Saul*, 806 F. App'x 816, 517 (9th Cir. 2020) (unpublished) (the ALJ did not err in rejecting a treating physician's statement that a petitioner was not capable of working as a cashier because this was a "vocational conclusion that was outside his area of expertise"). While qualified to issue opinions about Petitioner's medical conditions and the extent of her impairments, Dr. DeNagy was not an expert in what constitutes a sheltered work environment and was not qualified to predict whether other employers would hire Petitioner, or how the FMLA would affect her ability to work. These non-medical suppositions provided a rational reason, supported by substantial evidence, for the ALJ to reject Dr. DeNagy's resulting conclusions about Petitioner's ability to work.

*iv. Evidence of Lack of Hospitalizations or Emergency Room Visits*

The only other challenge Petitioner raises to the ALJ's treatment of Dr. DeNagy is that the ALJ factually erred in concluding that Petitioner had not been hospitalized for mental illness. Pt.'s Br. at 14 (Dkt. 22).

The contested portion of the ALJ's opinion reads: "[Dr. DeNagy's] marked and extreme findings are inconsistent with the records. One would expect emergency room visits or hospitalizations related to [Petitioner's] mental health conditions with such profound limitations. Yet, there is little evidence of such treatment." AR 24.

Contrary to these findings, Petitioner avers that she was hospitalized for mental illness and cites to several emergency room records to support this claim. *Id.* (citing AR 679, 789, and 1537-1540). These hospital visits, however, were for insomnia (AR 1537), "chronic intractable migraines" (AR 677, 791, 1540), and fibromyalgia (AR 791, 1537), not mental health crises. Petitioner also cites one counseling record. Pt.'s Br. at 14 (Dkt. 22) (citing AR 1841). This record states that Petitioner requires increased financial support to access the mental health care she needs and that without this financial support she "may" end up needing "high levels of care, such as inpatient hospitalization." AR 1841. Once again, this record does not gainsay the ALJ's observation that Petitioner was never, in fact, hospitalized for mental illness. Petitioner's challenge to this statement, therefore, fails.

D. The ALJ identified specific and legitimate reasons supported by substantial evidence for only giving partial weight to the opinions of Dr. Elder.

On December 18, 2018, Dr. Elder conducted a mental status evaluation of Petitioner at the request of the ALJ and DDS. AR 1650. Dr. Elder documented his conclusions in a written report that included both a narrative statement and a check-box assessment of Petitioner's work-related mental abilities. AR 1647-1657. In the check-box portion of the report, Dr. Elder found

that Petitioner had extreme limitations in her ability to make complex work-related judgments and to interact appropriately with the public; marked limitations in all other social domains and in her ability to understand, remember, and carry out complex instructions; and moderate limitations in her ability to understand, remember, and carry out simple instructions and make simple work-related judgments. AR 1647-1648.

The ALJ gave these opinions "some weight." AR 26. He credited the more conservative portions of the opinion but rejecting the subset of Dr. Elder's findings positing "marked-to-extreme" limitations in Petitioner's mental and social functioning. *Id.*

The ALJ articulated three reasons for rejecting the "marked-to-extreme" limitations found in the checkbox form: (i) inconsistency between these limitations and Dr. Elder's narrative, (ii) the Petitioner's "history of minimal, conservative mental health treatment with, overall, normal mental status examinations," and (iii) the Petitioner's reported activities. Petitioner argues that none of these reasons were supported by substantial evidence. The Court disagrees; the ALJ identified at least two pieces of evidence that a reasonable mind could view as seriously undermining Dr. Elder's findings of marked-to-extreme mental limitations.

### i. Dr. Elder's Inconsistent Narrative

In his narrative report, Dr. Elder wrote that Petitioner was "capable of navigating social situations and has basic skills for conversing and appearing friendly." AR 1654. Further, he wrote that she was also "capable of maintaining a cordial relationship with co-workers." AR 1652. It was not unreasonable for the ALJ to conclude that these statements were inconsistent with a finding that Petitioner suffers marked or extreme limitations in all social domains. AR 1648.

The same can be said of Dr. Elder's conclusions regarding Petitioner's ability to follow complex instructions and make complex decisions. Dr. Elder marked that Petitioner was marked or extremely impaired in these domains. AR 1647. In the narrative portion of the report, however, Dr. Elder wrote that Petitioner's "ability to understand was good" and that Petitioner "did not show any limitations in comprehending the content discussed." AR 1656. Moreover, Dr. Elder's testing indicated that Petitioner's general cognitive functioning was "unimpaired," her insight into her mental health problems was "good," and her judgment across her lifespan was "fair." AR 1654-1656. These differences constitute legitimate reasons for the ALJ to discount the contested portions of Dr. Elder's opinions. *See Ford*, 950 F.3d at 1154.

> ii. *Petitioner's Mental Health Treatment History*

The ALJ also cited to a long list of Petitioner's treatment records to show that Petitioner's mental health treatment history was inconsistent with marked or extreme limitations. AR 26. Petitioner argues that the ALJ was wrong to describe this treatment as "minimal" or "conservative." Pt.'s Br. at 12-13 (Dkt. 22). Petitioner, however, does not provide the analysis or evidence necessary to support this argument. Petitioner does not discuss any of the records cited by the ALJ or explain why the ALJ was unreasonable in concluding that the record *as a whole* "revealed minimal, conservative mental health treatment with, overall, normal mental status examinations." AR 26.

The two pieces of allegedly countervailing evidence Petitioner identifies – two unconnected pages of the medical record – do little to advance her case. One of the citations is to a treatment record from Petitioner's rheumatologist pertaining to Petitioner's fibromyalgia. While this record mentions Petitioner's history of depression in passing, it does not opine on her

current mental status, address the severity of her depression, or comprehensively summarize her mental health treatment history.  AR 1535.

The other record Petitioner cites is a letter from one of her counselors, Licensed Professional Counselor P. Christine Buxton.  This letter declares that Petitioner's "long established history of major medical and mental health issues . . . make it impossible for her to support herself without additional aid from family."  AR 1838.  Critically, this is an isolated, one-page letter, that was separately discredited by the ALJ[7] and that contains little discussion of Petitioner's treatment history and no discussion of the numerous *other* mental status examinations on which the ALJ relied.

The letter indicates that Petitioner has received counseling for depression, anxiety, and PTSD since at least 2015.  But these facts are not in dispute.  The ALJ agreed that Petitioner's depression, generalized anxiety disorder, and PTSD were "severe" impairments, which limited her ability to perform basic work activities.  AR 16.  Consistent with this finding, the ALJ specifically recognized that Petitioner had long been receiving treatment for anxiety and depression (AR 21).

The question presented here is whether the ALJ was correct to characterize this treatment as "minimal" and "conservative."  The letter simply does not answer this question.  It does not indicate how often Petitioner was attending counseling sessions, how many medications she was taking for her mental illnesses, or whether she received any other forms of mental health treatment.

---

[7] The ALJ assigned "little weight" to Counselor Buxton's opinion because the opinion lacked objective findings, was vague, and was inconsistent with Petitioner's history of working.  AR 26-27.  Petitioner has not challenged this rejection on appeal.

The Court declines to sieve through a nearly two-thousand-page record on Petitioner's behalf looking for such evidence. *See Ludwig v. Astrue*, 681 F.3d at 1053 (in a social security case, the burden is on the party claiming error to demonstrate that error). As numerous circuit courts have colorfully warned, "[j]udges are not like pigs, hunting for truffles buried in briefs." *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). This principle applies with double force to evidence "buried in disorganized, scattershot evidentiary submissions" such as the Administrative Record. *See Faulkner v. Wausau Bus. Ins. Co.*, 571 F. App'x 566, 569 (9th Cir. 2014) (unpublished). To preserve a challenge to an ALJ's finding for review, it is Petitioner's responsibility to develop that challenge with citations to the law and the record. *See Carmickle v. Comm'r of Social Sec. Admin*, 533 F.3d 1155, 1161 n. 2 (9th Cir. 2008) (refusing to address an ALJ's finding where the Petitioner "failed to argue [the] issue with any specificity in his briefing."); *see also Burkett v. Saul*, 806 F. App'x 509, 512 (9th Cir. 2020) (unpublished) (where Petitioner "summarily" concluded that various medical findings supported the medical opinion evidence that the ALJ had rejected, this broad assertion was insufficient to preserve the issue for review). Petitioner has not satisfied that burden as to this sub-issue.

### iii. Petitioner's Reported Activities

The third reason the ALJ identified for discounting Dr. Elder's marked-to-extreme findings is that these findings do not match Petitioner's reported activities. For the reasons discussed in detail above, *see supra* Section I(C)(ii), the Court agrees with Respondent that Petitioner's reported activities – specifically her care of her autistic son, her management of her household finances, and her work as a peer support counselor – are legitimate and reasonable grounds for the ALJ to have rejected Dr. Elder's finding of marked-to-extreme mental and social impairments.

II.    Petitioner's Pain and Symptom Testimony

Petitioner's final claim of error relates to the ALJ's rejection of her pain and symptom testimony.  Pt.'s Br. at 16-17 (Dkt. 22).

When evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991).  Second, if such objective medical evidence exists, and the ALJ has not determined that the claimant is malingering, the ALJ must provide clear and convincing reasons before rejecting the claimant's testimony regarding the severity of the claimant's symptoms.  *Id.*

Generalized findings will not satisfy this standard.  The reasons an ALJ provides for rejecting a claimant's symptom testimony "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Bunnell*, 947 F.2d at 345-46).  This requires that the ALJ "identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Id.* at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1988)).

Petitioner contends the ALJ violated these rules by failing to issue sufficiently detailed reasons for rejecting her testimony.  The Court is unpersuaded.  Unlike in the cases Petitioner cites, the ALJ's discussion of Petitioner's testimony included far more than boilerplate and vague allegations.  *Compare* AR 21-22 *with Treichler*, 775 F.3d at 1102-1103 (finding that an ALJ erred in rejecting a claimant's testimony where the only explanation provided for the rejection

was a "single general statement [asserting] that 'the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment'"); *Vasquez v. Astrue*, 572 F.3d 586, 592 (9th Cir. 2009) (the "vague allegation" that the petitioner's testimony was "not consistent with the objective medical evidence" did not satisfy the ALJ's obligation to make specific findings supporting an adverse credibility determination).

Here, after describing Petitioner's symptom testimony in detail, the ALJ provided a six-paragraph explanation for rejecting Petitioner's claims that near-constant fatigue, pain, anxiety, and depression prevent her from working. AR 20-22. Five of these paragraphs are case-specific, discussing Petitioner's medical record, MRI results, the notes of her treating doctors, mental status evaluations, and reported activities. *Id.* As is required, these paragraphs identify the testimony the ALJ rejected – for example, Petitioner's claims of crippling fatigue, pain, and migraines or, by comparison, Petitioner's claims of debilitating anxiety and depression – and provide numerous citations to evidence that the ALJ determined to be inconsistent with these areas of testimony. *Id.* While the ALJ does not analyze Petitioner's testimony at the most granular, function-by-function level, that is not required. *See Treichler*, 775 F.3d at 1103 (an ALJ's analysis of a claimant's testimony "need not be extensive"); *see also Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) ("Our cases do not require ALJs to perform a line-by-line exegesis of the claimant's testimony, nor do they require ALJs to draft dissertations when denying benefits."). The reasons the ALJ provided for rejecting Petitioner's pain and fatigue testimony – including, among many other reasons, Petitioner's full musculoskeletal range of motion; alertness at medical appointments; intact attention and concentration; and ability to work

part time as a peer support worker – were sufficiently particular to permit meaningfully judicial review.

Because Petitioner has not identified any infirmity within the substance of this reasoning, the Court will not substitute its interpretation of the evidence for the ALJ's reasoned decision.

## <u>CONCLUSION</u>

If the evidence is susceptible to more than one rational interpretation, one of which is the ALJ's, the Court may not substitute its interpretation for that of the ALJ. *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). The ALJ has provided reasonable and rational support for his conclusions, according to the proper legal standards. Therefore, the Commissioner's decision will be affirmed, and Petitioner's Motion for Summary Judgment will be denied.

## <u>ORDER</u>

Based on the foregoing, Petitioner's Petition for Review and the accompanying Motion for Summary Judgment (Dkts. 1 & 22) are **DENIED,** and the decision of the Commissioner is **AFFIRMED.**

DATED: July 15, 2021

Raymond E. Patricco
U.S. Magistrate Judge